

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00408-CV

_____

CITY OF FORT WORTH, Appellant

V.

SOLEDAD ALVAREZ, INDIVIDUALLY AND AS REPRESENTATIVE OF THE
ESTATE OF JESSICA ROMERO; AND SONYA TORRES, INDIVIDUALLY AND
AS REPRESENTATIVE OF THE ESTATE OF LLAYLANII ROMERO, Appellees

---

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-316458-20

---

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellant City of Fort Worth appeals from the trial court's order denying its plea to the jurisdiction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8). In two issues, the City argues that the trial court erred by denying its jurisdictional plea because Appellees Soledad Alvarez, Individually and as Representative of the Estate of Jessica Romero, and Sonya Torres, Individually and as Representative of the Estate of Llaylanii Romero, did not establish that the Texas Tort Claims Act (TTCA) waived the City's governmental immunity against Appellees' premises-defect and special-defect claims. *See generally id.* §§ 101.001–.109. We hold that although Appellees' pleadings and the jurisdictional evidence are insufficient to establish the trial court's jurisdiction, the pleadings do not show an incurable jurisdictional defect regarding Appellees' premises-defect claim. We thus reverse the trial court's order, render judgment dismissing Appellees' special-defect claim, and remand Appellees' premises-defect claim to the trial court to give Appellees an opportunity to amend their pleadings on that claim.

## I. Background

Appellees alleged in their first amended petition that on September 8, 2018, Jessica Romero and her two-year-old daughter Llaylanii Romero were traveling in a vehicle on the northbound access road of East Loop 820 in Fort Worth. At or near 4501 East Loop 820 South ("the property"), floodwaters swept the vehicle "off the

roadway into a rain[-]filled excavation that had improper drainage due to a defective excavation." Jessica and Llaylanii were trapped in the vehicle and drowned.

In addition to the City, Appellees sued Whiz-Q, Inc. d/b/a Whiz-Q Stone (the owner of the property upon which the "defective excavation" was located); Lawhon, Inc. (the property's previous owner); The City of Arlington; and the Texas Department of Transportation (TxDOT). In support of their negligence claim against Whiz-Q, Appellees pleaded that Whiz-Q "owned and operated the stone yard located at [the property], including the excavation next to the roadway." Appellees also alleged special-defect and premises-defect claims against the cities and TxDOT. In support of their special-defect claim, Appellees pleaded in relevant part that "Defendants are units of government that owned, occupied, or controlled the defective excavation at or near" the property and that Jessica and Llaylanii "both drowned as a result of an improper drainage due to a defective excavation, a special defect on Defendants' premises." In support of their premises-defect claim, Appellees similarly pleaded that "Defendants are units of government that were in control of the defective excavation in question at or near" the property and that "[t]he improper drainage of the excavation, in which Jessica . . . and Llaylanii . . . drowned, were defective conditions which posed an unreasonable risk of harm."

The City filed a plea to the jurisdiction claiming that its immunity was not waived because it did not own, occupy, or control "the property where this incident occurred." According to the City's plea and the attached evidence, TxDOT owns a 6'

3

by 6' box culvert that runs underneath East Loop 820 and the access road. The box culvert discharges into a ditch on the property, and the ditch drains into a 72" corrugated metal pipe (CMP) that runs under the property and eventually discharges into Lake Arlington's flood zone. The City asserted that "[t]he flooding occurred when water backed up from a culvert" located on the property and onto the access road and that Jessica's "vehicle was overtaken by the water and swept off the roadway and into the culvert." The City argued that it did not own, operate, or control the access road or "the bar ditch where this incident took place" because (1) TxDOT was responsible for maintaining the access road and the box culvert under a Municipal Maintenance Agreement (the "MMA") between the City and TxDOT; (2) TxDOT owned the box culvert; (3) Whiz-Q owned and controlled the property, upon which the ditch and the 72" CMP are located; and (4) TxDOT has an easement that includes the area from the box culvert's exit to the pipe's opening, which is located on the property. The trial court denied the plea,[1] and the City appealed.

## II. Governmental Immunity and Standard of Review

Unless the state consents to suit, sovereign immunity deprives a trial court of jurisdiction over lawsuits against the state or certain governmental units. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004) (op. on reh'g). Cities are

---

[1]The City of Arlington also filed a jurisdictional plea alleging that it does not "own, control, or manage" any property at or near the access road and that the property is outside its city limits. The trial court granted the City of Arlington's plea.

4

political subdivisions of the state and, absent waiver, are similarly entitled to governmental immunity. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006) (op. on reh'g).

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). A jurisdictional plea's purpose is to defeat a cause of action without regard to the asserted claims' merits. *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Whether the trial court has subject-matter jurisdiction is a legal question that we review de novo. *Miranda*, 133 S.W.3d at 226.

A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). When, as here, the plea challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised. *See Miranda*, 133 S.W.3d at 227. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Id.* at 227–28. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228. This standard mirrors our review of summary judgments, and we therefore take as true all evidence favorable to the nonmovant, indulging every reasonable inference

5

and resolving any doubts in the nonmovant's favor. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009); *see* Tex. R. Civ. P. 166a(c).

### III. Appellees' Pleadings

Before we address the City's two issues, we must first examine Appellees' pleadings, which assert premises-defect and special-defect claims based on the City's alleged ownership, occupation, or control of the "defective excavation" on Whiz-Q's property. On appeal, Appellees assert that "[b]ecause certain off-road conditions may be special defects or premises defects, and flooded roadways from drainage deficiencies may be premises defects, the City . . . could potentially be liable." They thus contend that construing their pleadings liberally in their favor "requires an interpretation of [their] allegations that incorporates the theory that the City owned, occupied, or controlled the roadway, the culvert below, and the defect(s) posing a threat to the ordinary users of that particular roadway." Specifically, Appellees urge us to construe their pleadings to include the flood waters on the access road as the defective condition. The City disagrees with Appellees' proposed construction, arguing that "[n]owhere in their live pleadings do Appellees allege the premise[s] is anything other than the 'defective excavation'" and that Appellees cannot "redefine and reframe the alleged defective premises on appeal."[2]

---

[2] The City makes these arguments for the first time on appeal even though it argued in its jurisdictional plea that it did not own, operate, or control the access road and specifically stated in its reply that the premises included the access road.

We agree with the City. Even the most liberal construction of Appellees' pleadings does not support their interpretation. *See Matzen v. McLane*, No. 20-0523, 2021 WL 5977218, at *10 (Tex. Dec. 17, 2021) ("Even 'a liberal construction does not require a court to read into a petition what is plainly not there.'" (quoting *Bos v. Smith*, 556 S.W.3d 293, 306 (Tex. 2018))). As noted, Appellees alleged in their live pleadings that Jessica's "vehicle was swept off the roadway into a rain[-]filled excavation that had improper drainage due to a defective excavation." Appellees pleaded that Whiz-Q owned the property where the excavation was located. In support of their special-defect claims against the City, Appellees pleaded that the City "owned, occupied[,] or controlled the defective excavation" at or near the property and that Jessica and Llaylanii "both drowned as a result of an improper drainage due to a defective excavation, a special defect on Defendants' premises." In support of their premises-defect claim, Appellees similarly pleaded that the City was "in control of the defective excavation in question at or near" the property and that "[t]he improper drainage of the excavation, in which Jessica . . . and Llaylanii . . . drowned, were defective conditions which posed an unreasonable risk of harm." Construing these pleadings liberally and in the Appellees' favor and looking to their intent, we conclude that Appellees have pleaded that the defective excavation on Whiz-Q's property was the condition that posed an unreasonable risk of harm to Jessica and Llaylanii.

## IV. Duty

In its first issue, the City argues that it does not own, occupy, or control the premises where the drownings occurred. In its second issue, the City contends that it did not have a duty to make the premises safe because it did not create the dangerous condition or agree to make safe a known, dangerous condition. The City argues that its jurisdictional evidence shows that Whiz-Q owned the property where the "defective excavation" was located, that TxDOT and Whiz-Q controlled the drainage infrastructure that caused the flooding on the access road, and that the MMA requires TxDOT to maintain drainage facilities within its right-of-way and State drainage easements. The City thus asserts that it owed no duty to Jessica and Llaylanii to make the premises safe.

### A. Applicable law

The TTCA waives governmental immunity for personal injury or death caused by a condition or use of tangible personal or real property "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2); *see id.* § 101.001(3)(B) (defining "governmental unit" to include cities), § 101.022 (identifying duties owed), § 101.025(a) (providing that "[s]overeign immunity to suit is waived and abolished to the extent of liability created by this chapter"). A plaintiff relying on the TTCA "must prove the existence and violation of a legal duty owed him by the defendant." *City of Denton v. Page*, 701 S.W.2d 831, 834 (Tex. 1986) (describing duty as a "threshold

8

issue"); *Dominguez v. City of Fort Worth*, No. 2-06-196-CV, 2008 WL 623583, at *2 (Tex. App.—Fort Worth Mar. 6, 2008, pet. denied) (mem. op.) ("If a plaintiff fails to prove the existence and violation of a legal duty sufficient to impose liability under the [TTCA], sovereign immunity remains intact."). Whether a duty exists is a legal question. *City of Wichita Falls v. Romm*, No. 2-09-237-CV, 2010 WL 598678, at *2 (Tex. App.—Fort Worth Feb. 18, 2010, no pet.) (mem. op.).

When, as here, a claim arises from a premises defect involving real property, Section 101.022(a) of the TTCA limits the governmental unit's duty to that which a private person owes a licensee on private property. Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a). Under Section 101.022(b), however, this limitation of duty does not apply to the duty to warn of special defects such as excavations or obstructions. *Id.* § 101.022(b). In such a case, the governmental unit owes the duty a private landowner owes an invitee. *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992).

"As a rule, to prevail on a premises liability claim a plaintiff must prove that the defendant possessed—that is, owned, occupied, or controlled—the premises where [the] injury occurred." *Wilson v. Tex. Parks & Wildlife Dep't*, 8 S.W.3d 634, 635 (Tex. 1999); *see City of Jersey Vill. v. Killough*, No. 01-20-00823-CV, 2021 WL 5903988, at *5 (Tex. App.—Houston [1st Dist.] Dec. 14, 2021, no pet.) (mem. op.) ("To impose a legal duty on a governmental unit, the plaintiff must show that the governmental unit owned, occupied, or controlled the premises where the injury occurred."). Here, it is

9

undisputed that the City does not own the property. But a premises-liability defendant may be held liable for a dangerous condition on real property if it "assum[ed] control over and responsibility for the premises," even if it did not own or physically occupy the property. *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002) (quoting *Page*, 701 S.W.2d at 835). "The relevant inquiry is whether the defendant assumed sufficient control over the part of the premises that presented the alleged danger so that the defendant had the responsibility to remedy it." *Id.*; *Carter v. City of Galveston*, No. 01-07-01010-CV, 2008 WL 4965351, at *2 (Tex. App.—Houston [1st Dist.] Nov. 20, 2008, no pet.) (mem. op.) ("In both a regular premises[-]defect case and a special[-]defect case, the duty of care 'arises only for an occupier with control of the premises.'" (quoting *Gunn v. Harris Methodist Affiliated Hosps.*, 887 S.W.2d 248, 251 (Tex. App.—Fort Worth 1994, writ denied))). But a defendant who does not own, occupy, or control a premises may nevertheless be liable if it created the dangerous condition or agreed to make safe a known, dangerous condition. *See Page*, 701 S.W.2d at 835.

## B. The jurisdictional evidence

Here, the jurisdictional evidence included (1) a general warranty deed with vendor's lien; (2) the MMA; (3) a January 2020 "Drainage Study for IH 820 at Whiz Q Stone"; (4) the Executive Summary from the City's August 2016 Lake Arlington Drainage Master Plan; and (5) an affidavit from Clair Davis, the City's Engineering Manager & Floodplain Administrator.

**1.** *The general warranty deed*

According to the warranty deed, Lawhon sold the property to Whiz-Q in December 2005. It is undisputed that Whiz-Q owned the property when Jessica and Llaylanii drowned there.

**2.** *The MMA*

The MMA—which the City and TxDOT executed in December 2007—expressly recognized that Chapter 311 of the Texas Transportation Code "gives the City exclusive dominion, control, and jurisdiction over and under the public streets within its corporate limits and authorizes the City to enter [into] agreements with the State to fix responsibilities for maintenance, control, supervision, and regulation of State highways within and through its corporate limits." *See* Tex. Transp. Code Ann. §§ 311.001–.904. The MMA further recognized that Section 221.002 of the Transportation Code "authorizes the State, at its discretion, to enter [into] agreements with cities to fix responsibilities for maintenance, control, supervision, and regulation of State highways within and through the corporate limits of such cities." *See id.* § 221.002

Under the MMA's terms, the State's responsibilities for "controlled access highways," which included Interstate 820, are as follows:

- "Maintain the traveled surface of the through lanes, ramps, and frontage roads and foundations beneath such traveled surface necessary for the proper support of same under vehicular loads encountered."

11

- "Mow and clean up litter within the outermost curbs of the frontage roads or the entire right-of-way width where no frontage roads exist, and assist in performing these operations between the right-of-way line and the outermost curb or crown line of the frontage roads in undeveloped areas."

- "Sweep and otherwise clean the through lanes, ramps, separation structures, or roadways and frontage roads."

- "Remove snow and control ice on the through lanes and ramps and assist in these operations as the availability of equipment and labor will allow on the frontage roads and grade separation structures or roadways."

- "[I]nstall and maintain all normal markings and signs, including sign operation if applicable, on the main lanes and frontage roads" except as provided under the MMA's general conditions.

- "Install, operate, and maintain traffic signals at ramps and frontage road intersections unless covered by separate agreement."

- "Maintain all drainage facilities within the limits of the right-of-way and State drainage easements. This does not relieve the City of its responsibility for drainage of the highway facility within its corporate limits."

The City's responsibilities included prohibiting parking on frontage roads, main lanes, and ramps; providing for one-way traffic on frontage roads generally; securing the State's approval before any installation, repair, removal, or adjustment of utilities "crossing over or under the highway facility or entering the right-of-way"; enforcing "the control of access to the expressway/freeway facility"; installing and maintaining parking-restriction signs, pedestrian crosswalks, and parking stripes; and signing and marking city streets intersecting State highways.

### 3. *The drainage study*

In January 2020, TxDOT performed a drainage study "to determine what storm frequency floods the existing IH 820 Northbound frontage [road] just upstream of the 72" pipe culvert located on the Whiz Q Stone property." According to the resulting report, Whiz-Q's "place of business" is on the property.

In the report, James D. Friels, P.E., CFM stated that TxDOT's 6' by 6' box culvert under IH 820's main lanes and service roads discharges about 139' upstream from the 72" CMP located on Whiz Q's property and that TxDOT has an easement at the box culvert's exit. Friels explained that before February 2001, there was a natural stream flowing from TxDOT's culvert to Lake Arlington, but a man-made channel was later constructed to convey this flow to the lake. Around June 2003, a pipe was placed over the channel and fill was placed over the pipe, which resulted in the filling in of about 70% of the surface area of TxDOT's easement. Friels went on to explain that

> The area of concern is the IH 820 Northbound frontage rd. which is about 170' upstream of the 72" CMP on the Whiz Q Stone property. . . . The frontage road vertical profile is in a sag vertical curve at this location with the low point roadway elevation being at about 579.10' in elevation. Existing contours of the area downstream of the 72" CMP are higher elevation than the low point of the frontage rd. Therefore, the topography of the land is in effect creating a bowl where water is trapped at the low point of the frontage rd. when storm water flows back up from 72" CMP entrance. The overtopping elevation of the 72" CMP is about 581.50', which is approximately 2.4' higher than the low point of the frontage rd.
>
> . . . .

13

The IH 820~6'x6' box culvert discharges approximately 139' upstream of the 72" CMP culvert entrance. The 72" CMP on the Whiz Q Stone property is over 948.62 feet long, and then discharges into the flood zone of Lake Arlington. The existing topography of the Whiz Q Stone storage lot is approximately 2.4' higher than the low point of the IH 820 frontage rd. Therefore, there is nowhere for the water to go but through or over the 72" CMP, and there is potential to trap water on the low point of the frontage road depending on the downstream capacity of the 72" CMP.

Friels stated that to solve this problem,

the downstream capacity of the 72" CMP needs to be improved. The size of the pipe could be increased; however, because of the high tail water at the emergency spillway of the lake more hydraulic performance would be achieved by lowering the overtopping elevation of the culvert. The overtopping elevation of the 72" culvert on the Whiz Q Stone property would need to be lower than the low point elevation of the IH 820 frontage rd. This could easily be fixed by constructing a channel at the top of the culvert that drains to the lake. For a non-depressed roadway, TxDOT requires that the culvert be designed for a 25 yr. event. In other words, the 25-yr. headwater elevation at the 72" culvert headwall must be less than the low point of the frontage rd. (i.e. lowest edge of pavement). However, if the property owner is unable to lower the overtopping elevation to less than the low point of the frontage road, then the frontage road is classified as a depressed roadway, and the required design frequency becomes a 50 yr. event. Any solution would need to be designed by a licensed professional engineer within the State of Texas and would also need to be reviewed and approved by TxDOT.

### 4. *The Lake Arlington Drainage Master Plan's Executive Summary*

According to the August 2016 plan's executive summary,[3] Brown and Gay Engineers, Inc. developed the plan for the City "to evaluate existing storm sewer

---

[3]Appellees attached the plan's executive summary to their response to the City's plea. The 164-page plan is not in the record, but Appellees stated in their response that the plan "is available to the parties and the Court upon request." Appellees further stated that "[w]hile this document is not being brought forth to prove the

infrastructure, identify deficiencies, propose improvements, and develop a Capital Improvement Plan to implement these improvements for areas adjacent to Lake Arlington." The summary lists "Loop 820 Culvert Improvements" as one of fourteen recommended improvements.

**5.** *The Davis affidavit*

Clair Davis, the City's Engineering Manager & Floodplain Administrator, explained in her affidavit that the Lake Arlington Drainage Master Plan was developed for the City "to evaluate existing storm sewer infrastructure, identify deficiencies, propose improvements, and when necessary[,] develop a Capital Improvement Plan to implement for areas adjacent to Lake Arlington." She went on to explain that part of the master plan assessed "the drainage conditions in the basin where the fatality occurred":

> The location of the accident is on the northbound frontage road of Loop 820 East, approximately 700 feet south of the Wilbarger intersection. Drainage facilities in the area consist primarily of open ditches and channels, with some pipe systems and roadway culverts that convey storm water from approximately 231 acres upstream of the site. Industrial land uses comprise over 90% of the drainage basin area contributing to the site. The portion of Loop 820 adjacent to the site was constructed by TxDOT in the 1960's, including the 6'x6' box culvert that conveys most of the upstream drainage.
>
> Prior to 2001, storm water drained into a natural valley that flowed into Lake Arlington. This natural valley is reflected on the current

truth of any of the matters asserted therein, it is evidence that the City of Fort Worth had possession of and/or exercised dominion or control over the area" where Jessica and Llaylanii "lost their lives in flood water."

FEMA floodplain maps that used terrain data from 2001 to update the floodplain around Lake Arlington in 2009. However, the natural valley was filled in by a predecessor to Whiz Q between 2000 and 2005 as shown in a variety of aerial photos.

When the valley downstream of the site was filled in, a 72" private storm drain pipe was installed by a predecessor to Whiz Q across the property to convey storm water from the TxDOT 6'x6' box culvert to Lake Arlington. There are no plans or permits that document construction of the 72" private storm drain pipe.

The storm event that occurred on September 8, 2018[,] produced rainfall across most of Tarrant County. Some of the most extreme precipitation recorded during this event was at rain gauges that flanked the basin draining through the accident site. These two gauges are approximately 1.5 miles apart and nearly equally spaced on either side of the basin in question.

The rain gauge south of the site at 5100 Parker Henderson Rd. recorded 10, 25, and 10 year intensities for the 2-, 3-, and 6-hour periods. The rain gauge to the north at 4800 Eastland Street recorded 50-year intensities for the 1-, 2-, and 3-hour periods, and a 25-year intensity for the 6-hour period.

The Lake Arlington Master Plan also researched historic complaints for this study area. Only 4 other complaints were recorded, all related to clogged storm drains unrelated to the accident location. . . .

With respect to all drainage studies, while the City reviews all of the recommendations, priorities must be established given public resources and access to infrastructure to be improved, especially whether the City owns the infrastructure in question. With respect to the Lake Arlington study in particular, the City was not in a position to make improvements since the drainage infrastructure was under the control of Texas Department of Transportation. Furthermore, the location of the accident had not been the subject of flooding.

## C. Analysis

The City's jurisdictional evidence shows that, at the time of the accident, the City did not possess—that is own, occupy, or control—the property or the defective

16

excavation on the property. Whiz-Q owns and operates its business on the property where the ditch and the 72" CMP are located. TxDOT's easement extends from the box culvert's exit to the entrance of the 72" CMP, which was placed over TxDOT's channel easement in 2003. According to the MMA, TxDOT is responsible for maintaining "all drainage facilities within the limits of the right-of-way and State drainage easements." And although the City's Lake Arlington drainage plan's recommended improvements included "Loop 820 Culvert Improvements," Davis explained that "the City was not in a position to make improvements since the drainage infrastructure was under the control of [TxDOT]." The jurisdictional evidence thus shows that at the time of the accident, either Whiz-Q or TxDOT—not the City—possessed the property and the alleged "defective excavation."

The City next argues that it owed no duty to Jessica and Llaylanii because the City did not create the dangerous condition or agree to make that condition safe.[4] As noted, a premises-liability defendant that does not own, occupy, or control the premises may nevertheless be liable if it created the dangerous condition or agreed to make safe a known, dangerous condition. *See Page*, 701 S.W.2d at 835. Here, the

_____

[4]The City made these arguments below even though Appellees did not plead that the City created the defective excavation or that the City agreed to make safe a known dangerous condition. Appellees admit in their brief that they "have not pleaded a negligent undertaking theory of liability at this time." But because the City has raised these immunity arguments, we must address them. *See, e.g.*, *Bansal v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 502 S.W.3d 347, 352 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 136 (Tex. 2015)).

17

jurisdictional evidence established that the City did not create the defective excavation. *See id.* Nor did the City agree to make safe a known, dangerous condition because, as Davis explained, the accident location "had not been the subject of flooding" and the City could not make drainage improvements because TxDOT controlled the drainage infrastructure. *See id.*

The City also argues for the first time on appeal that it is entitled to discretionary-function immunity for failing to take action in response to the drainage issues identified in the drainage study.[5] *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.056(2) (stating that the TTCA's immunity waiver "does not apply to a claim based on . . . a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit"). Appellees respond that they "make no complaint about [the City's] planning and/or construction of drainage improvements—no such improvements were ever made in this case about which Appellees could complain." Even so, such claims would implicate the City's discretionary functions, and governmental immunity would bar them. *See, e.g.*, *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002); *City of Austin v. Leggett*, 257 S.W.3d 456, 469 (Tex. App.—Austin 2008, pet. denied).

---

[5]Even though the City has raised this jurisdictional argument for the first time on appeal, we must address it. *See id.*

Accordingly, taking as true all evidence favorable to Appellees and indulging every reasonable inference and resolving any doubts in their favor, we hold that, as pleaded, Appellees failed to assert claims sufficient to invoke a waiver of the City's immunity under the TTCA. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021(2), .022. We sustain the City's two issues.

## V. Pleading Amendment

The City asks us to render judgment dismissing Appellees' claims. If a plaintiff's pleadings do not contain facts sufficient to demonstrate a waiver of immunity under the TTCA but do not affirmatively demonstrate an incurable defect in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded an opportunity to amend. *Miranda*, 133 S.W.3d at 226–27. But if the party that raised the jurisdictional defense can show (1) that the "the pleadings or record . . . conclusively negate the existence of jurisdiction"; (2) that the plaintiff did in fact have a "full and fair opportunity in the trial court to develop the record and amend the pleadings"; or (3) that even with a remand "the plaintiff would be unable to show the existence of jurisdiction," then the case should be dismissed without affording an opportunity to amend. *Harris Cnty. v. Annab*, 547 S.W.3d 609, 616 (Tex. 2018) (quoting *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 96–97 (Tex. 2012)). A plaintiff may have lacked a fair opportunity to amend in the trial court if, for example, the jurisdictional issue arose for the first time on appeal. *See Clint ISD v. Marquez*, 487 S.W.3d 538, 558–59 (Tex. 2016).

19

Although a flooded roadway is not a special defect,[6] it can be—as Appellees point out—a premises defect. *See Reyes*, 335 S.W.3d at 608; *Leggett*, 257 S.W.3d at 475. And while it is undisputed that the State rather than the City owns the access road, *see Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 644–45 (Tex. 2004), the following provision in the MMA suffices to raise a fact issue regarding the City's possession of the access road: "[The State will] [m]aintain all drainage facilities within the limits of the right-of-way and State drainage easements. *This does not relieve the City of its responsibility for drainage of the highway facility within its corporate limits.*" [Emphasis added.] *See Brown*, 80 S.W.3d at 553, 556 (concluding that although the State owned the causeway and its streetlight system, plaintiff adequately alleged that county possessed causeway because plaintiff pleaded that county "maintained the [causeway] pursuant to a contract with the State," and it was undisputed that county assumed certain maintenance responsibilities over the causeway's lighting system under an agreement with TxDOT). Accordingly, although we have sustained the City's two issues, we must remand the case to the trial court to afford Appellees the opportunity to amend their pleadings regarding their premises-defect claim. *See Rusk State Hosp.*, 392 S.W.3d at 96–97.

---

[6]*See generally Reyes v. City of Laredo*, 335 S.W.3d 605, 607 (Tex. 2010) (discussing what constitutes a "special defect"); *City of Arlington v. S.C.*, No. 02-17-00002-CV, 2017 WL 3910992, at *2–3 (Tex. App.—Fort Worth Sept. 7, 2017, no pet.) (mem. op.) (same).

## VI. Conclusion

Having sustained the City's two issues, we reverse the trial court's order denying the City's plea to the jurisdiction, render judgment dismissing Appellees' special-defect claim, and remand Appellees' premises-defect claim to the trial court for further proceedings consistent with this opinion.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: February 10, 2022

21